**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **HEALTHBRIDGE FINANCIAL, INC.** | ) | |
| **and GREGORY VANDENBOSCH** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION FILE NO.** |
| **v.** | ) | |
| | ) | _____ |
| **DANIEL MALVEN** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs HealthBridge Financial, Inc. ("HealthBridge") and Gregory VandenBosch ("VandenBosch"), by and through their counsel, file this Complaint for Declaratory Judgment against Defendant Daniel Malven ("Malven").

## INTRODUCTION

This dispute arises from a series of exploratory conversations that never matured into any binding commitment. Over the course of several months, Plaintiffs HealthBridge and its Chief Executive Officer (CEO), Gregory VandenBosch, discussed with Defendant Malven the possibility of Malven joining HealthBridge in an executive capacity. Those discussions were fluid, preliminary, and often evolving—marked by draft spreadsheets, tentative proposals, and concepts still very much in flux. At no point did the parties reach a final agreement on essential terms, nor did HealthBridge's Board of Directors or any HealthBridge executive execute any written instrument reflecting such an agreement. Ultimately, Malven accepted a different written offer that HealthBridge did extend—one with materially different, limited terms—and he performed under

that offer for more than a year. Plaintiffs now seek a declaratory judgment to confirm what the facts already make clear: that no enforceable executive employment contract ever existed between the parties.

## PARTIES

1.      HealthBridge is headquartered in Michigan and partners with healthcare providers to offer a patient financial program with compassionate and affordable terms to all patients for the payment of their medical out-of-pocket costs.

2.      HealthBridge is incorporated in Delaware, with a principal place of business in Grand Rapids, Michigan.

3.      VandenBosch is a resident of the state of Michigan and co-founder and CEO of HealthBridge.

4.      Malven is a resident of the state of Illinois and former investor, Board member, Head of Capital Markets and Chief Financial Officer of HealthBridge. Upon information and belief, he may be served with process at 4219 North Winchester Avenue, Chicago, IL 60613.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this proceeding under 28 U.S.C. § 1332(a), because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs are citizens of the State of Michigan, and Defendant is a citizen of the State of Illinois. No Plaintiff shares citizenship with Defendant for purposes of diversity jurisdiction, and therefore complete diversity exists.

6.      Venue is proper under 28 U.S.C. § 1391(b) because the key events giving rise to Plaintiffs' claims occurred within this judicial district. The communications, preliminary negotiations, and alleged representations that Plaintiffs contend demonstrate the absence of any

enforceable contract between the parties were directed to, received in, and evaluated by Plaintiffs in this district. Plaintiffs' understanding of the parties' dealings, their reliance on Defendant's statements, and their discovery that no binding agreement had been formed all took place here. Because the operative facts establishing the nonexistence of any enforceable contract occurred within this judicial district, venue is proper here regardless of Defendant's out-of-district residence.

## **FACTUAL BACKGROUND**

7.      At all relevant times, VandenBosch served as HealthBridge's CEO and a member of the company's Board of Directors.

8.      In or around April 2021, Malven was a Managing Director of 4490 Ventures and, in that capacity, led a $10 million preferred stock financing round for HealthBridge.

9.      In or around April 2023, HealthBridge's Board of Directors consisted of Malven, VandenBosch, and Hin-King Tai.

10.     In or around October 2023, Malven resigned from the 4490-controlled seat on HealthBridge's Board and was replaced by Greg Robinson on January 13, 2024.

11.     In or around October 2023, VandenBosch and Malven discussed the possibility of Malven joining HealthBridge full-time as the Head of Capital Markets.

12.     From in or around November 2023 through in or around January 2024, VandenBosch and Malven engaged in preliminary executive compensation negotiations through verbal discussions, written proposals and draft spreadsheets.

13.     Each draft of Defendant's proposed executive compensation terms was complex, including potential deferred salary payments; a non-discretionary fund-raising cash bonus structure payable in multiple parts; a time-vested option grant with a 48-month vesting period and a 12-month

3

cliff; and a performance-vested option grant containing multiple pre-conditions, based on the form of equity raised, which would survive employment termination.

14.     These proposed executive compensation terms, which VandenBosch and Malven explored, were not performable within one year.

15.     VandenBosch and Malven never manifested any intent to be bound by these preliminary negotiations.

16.     Although VandenBosch and Malven discussed potential executive compensation, they did not reach a final agreement on all material terms.

17.     On or about January 14, 2024, Malven nevertheless sent VandenBosch a proposed written executive compensation agreement, containing specific desired terms, for HealthBridge's Board to review and sign.

18.     No Board member or HealthBridge executive signed Malven's proposed written compensation agreement.

19.     Neither HealthBridge's Board nor any executive and Malven ever executed a written instrument memorializing a final agreement as to any of the terms Malven proposed concerning potential executive compensation.

20.     Rather, on April 30, 2024, HealthBridge sent Malven a written offer of full-time employment as Head of Capital Markets, with a base salary of $120,000.00. (Exhibit 1, Offer Letter)

21.     In addition, the offer letter stated: "Conditioned on approval by the Board of Directors, you will receive a stock option grant that is appropriate for your position and pay. Terms of your options, including strike price and vesting schedule, will be contained in a separate stock option grant." (*Id.*)

22.     On May 1, 2024, Malven accepted HealthBridge's written offer. (*Id.*)

4

23.     Malven knew he had not received from the Board a signed copy of the proposed written executive compensation agreement which he had submitted to VandenBosch for Board consideration on or about January 14, 2024.

24.     Malven nevertheless chose to perform work for HealthBridge as Head of Capital Markets and subsequently as Chief Financial Officer, under the terms of his April 30, 2024, offer letter, until his termination on or about October 23, 2025.

25.      In November 2025, HealthBridge and Malven commenced discussions regarding a potential severance arrangement, but those negotiations ultimately broke down and no agreement was reached.

26.     On January 13, 2026, Malven sent Plaintiffs a letter of demand for payment of earned compensation and issuance of promised equity, seeking more than $30.5 million. (Exhibit 2, Demand Letter)

## COUNT I
## CLAIM FOR DECLARATORY RELIEF PURSUANT TO 28 U.S.C. §2201

27.     HealthBridge and VandenBosch incorporate all prior paragraphs of this Complaint.

28.     An actual controversy has arisen and presently exists between Plaintiffs and Defendant as to their respective rights and obligations; specifically, whether any enforceable contract was ever formed between them.

29.     To resolve this dispute, Plaintiffs respectfully request that this Court declare the parties' respective rights and obligations; in particular, Plaintiffs seek a judicial declaration that no enforceable contract exists between Plaintiffs and Defendant.

## PRAYER FOR RELIEF

**WHEREFORE,** HealthBridge and VandenBosch respectfully request judgment in their favor and against Defendant as follows:

(a) A declaration pursuant to 28 U.S.C. §2201 that no enforceable contract exists between Plaintiffs and Defendant;

(b) A declaration that Defendant has no contractual rights or obligations arising from any alleged agreement with Plaintiffs;

(c) Attorneys' fees, costs, and other expenses incurred in this action, to the extent permitted by law; and

(d) Such other and further legal and/or equitable relief as this Court deems just and proper.

Dated: January 30, 2026                    Respectfully submitted,

**HEALTHBRIDGE FINANCIAL, INC.**
**GREGORY VANDENBOSCH**


By: _/s/ Kelly E. Eisenlohr-Moul_
        One of Their Attorneys

Kelly E. Eisenlohr-Moul
JACKSON LEWIS P.C.
150 N. Michigan Ave., Suite 2500
Chicago, IL 60601
Telephone: (312) 787-4949
Facsimile: (312) 787-4995
Kelly.Eisenlohr-Moul@jacksonlewis.com

## CERTIFICATE OF SERVICE

I certify that on January 30, 2026, a copy of the foregoing **COMPLAINT FOR DECLARATORY JUDGMENT** was filed with the Court by electronic filing protocols, and that same will therefore be electronically served upon all attorneys of record registered with the Court's ECF/CM system.

*/s/ Kelly E. Eisenlohr-Moul*

# EXHIBIT 1



04/30/2024

Daniel Malven
mary.bennink@myhealthbridge.com

Dear Daniel,

Thank you for discussing employment opportunities at HealthBridge. We enjoyed learning about your background and goals for your career. Hopefully you gained a greater insight into our culture, operations and mission, and are excited about being a part of our story. After learning more about your skills and aspirations, we believe that engaging in an employment relationship will be mutually beneficial. On behalf of the leadership team, I am pleased to offer you the full-time, exempt position of Head of Capital Markets.  We would be delighted to have you join our team.

We would anticipate your start date with HealthBridge to be on or about 05/02/2024. You will report to Greg Vandenbosch, Chief Executive Officer. This offer is contingent upon successful completion of all background and reference checks, your execution of the Employee Confidentiality and Non-Solicitation Agreement and the Employee Handbook, and your submission of documents to provide satisfactory proof of identity and legal authorization to work in the United States upon the first day of employment

The additional elements of this offer are as follows:

**Base Salary**
You will be paid an annual salary rate of $120,000.00 which is subject to deductions for taxes and other withholdings as required by law or the policies of the company. You will be paid bi-weekly, every other Thursday.

**Employee Benefits**
You are eligible to receive the following benefits, subject to the terms and agreements of each plan:

- You will be expected to work out of your home office
- You will be eligible for the HealthBridge Financial, Inc., Health and Welfare Plan effective May 1, 2024, which includes the following benefits: medical, dental, vision and life insurance at 1x salary. You will also have an option of participating in our 401(k) Plan after six months of employment and electing voluntary life, STD and LTD benefits.
- Conditioned on approval by the Board of Directors, you will receive a stock option grant that is appropriate for your position and pay. Terms of your options, including strike price and vesting schedule, will be contained in a separate stock option grant.

**Paid Time Off & Holidays**

You are eligible to receive the following paid time off, subject to the terms and agreements of the Employee Handbook:

- PTO hours for first year: Executive team members enjoy an unlimited PTO balance
- Seven (7) Paid Holidays
  - New Year's Day
  - Memorial Day
  - Independence Day
  - Labor Day
  - Thanksgiving
  - Day after Thanksgiving
  - Christmas Day

Please note that your employment with HealthBridge constitutes "at will" employment and is not for a specified period.  As a result, you are free to resign at any time, for any reason or for no reason.  Likewise, HealthBridge is free to end its employment relationship with you at the sole discretion of HealthBridge with or without cause, and with or without notice.

We are pleased to have you join HealthBridge and we look forward to your early acceptance.   This offer is in effect until three business days following the date of this letter, although additional time for consideration of the offer may be made available if you find it necessary. If you accept the terms of this offer, please electronically sign via your ADP Career Center Portal.

We believe you will be a valuable addition to HealthBridge. Should you have any questions about starting with us, please do not hesitate to contact me.

Sincerely,


Mary Bennink, Vice President of Human Resources
HealthBridge

**ACCEPTED AND AGREED:**

By:    Date: _____

| **Candidate Response** |
|---|
| **Signature** |

| Offer Status: | Offer Accepted |
|---|---|
| Signer Name/Initials: | Daniel Malven |
| Login Id: | dan@malvenfamily.name |
| Date Electronically Signed: | May 1, 2024 at 4:10:52 PM EDT |

| Electronic Signature captured and verified by **ADP** |
|---|

# EXHIBIT 2



50 East Washington Street
Suite 400
Chicago, IL 60602

Lenny Gail
312.379.0470
lgail@masseygail.com

January 13, 2026

**VIA OVERNIGHT DELIVERY AND ELECTRONIC MAIL**
**SETTLEMENT COMMUNICATION—SUBJECT TO FRE 408**

HealthBridge Financial, Inc.
3200 Broadmoor Ave SE,
Grand Rapids, MI 49512

ATTN:
Gian Fulgoni and Tami Reller
Compensation Committee of the current Board of Directors
Greg VandenBosch, Greg Robinson and Hin-King Tai
Board of Directors in January 2024

Greg VandenBosch
1500 Honey Creek Ave NE
Ada, MI 49301

> *Re:    Demand for Payment of Earned Compensation And Issuance of*
> *Promised Equity*

Dear Mr. Fulgoni, Ms. Reller, Mr. VandenBosch, Mr. Robinson and Mr. Tai:

My name is Lenny Gail, I'm a trial lawyer in Chicago, and my firm and I have been retained to represent Dan Malven in connection with his claims against HealthBridge Financial, Inc. ("HealthBridge" or the "Company") and Greg VandenBosch, jointly and severally (collectively, "You" or "Your").

The Company and Mr. VandenBosch face substantial liability for executive wage theft, including unpaid earned compensation and the wrongful withholding of promised equity. This exposure includes statutory penalties, attorneys' fees, and personal liability under the Illinois Wage Payment and Collection Act ("IWPCA"), as well as common law claims including breach of contract, fraudulent inducement, and unjust enrichment. We write (i) to initiate a dialogue concerning the possible amicable resolution of Mr. Malven's claims and (ii) to inform You of Your preservation obligations.

Mr. Malven sincerely hopes that these issues can be resolved by agreement. But that may not be realistic. As such, he reserves all rights to pursue any and all sensible avenues of recourse as necessary.

January 13, 2026
Page | 2

Please confirm promptly (i) receipt of this letter and (ii) implementation of a litigation hold and compliance with the preservation obligations below.  If you are interested in an amicable resolution, please indicate as such with your proposal by the end of the week—on or before Friday, **January 16, 2026, at 5:00 p.m. CT**.

## I.   FACTUAL BASIS & DEMAND

As outlined below, Mr. Malven's relationship with HealthBridge evolved from early investor and active board member, to joining full-time as Head of Capital Markets (HCM) with a negotiated, board-approved compensation package in January 2024. In mid-2024 when the then-CFO Paul Iles announced his retirement, Mr. VandenBosch asked Mr. Malven to take on the additional position of CFO. Mr. Malven agreed contingent upon hiring an experienced financial executive that would report to him, and Mr. Edmund Fleming, Jr., was subsequently hired into the role of Senior VP of Finance and Administration. Mr. Malven was then unceremoniously terminated in October 2025 and stripped of the vast majority of the board-approved compensation he had been promised.

In April 2021, Mr. Malven was a Managing Director of 4490 Ventures and, in that capacity, led a $10 million preferred stock financing round for HealthBridge.

As of early 2023, the Company had burned through roughly $50 million of investor capital and was insolvent.  The company received two acquisition offers, both of which valued the enterprise at roughly $2 million.  HealthBridge was in dire need of additional capital to continue operations. On February 8, 2023, Malven, as lead investor and board member, issued written notice to the executive team and the other board members that the Company was to begin a winddown process in the next 48 hours.

However, believing in the potential of the company—and its intended pivot from an employee-benefit product distributed through employer-sponsored health plans to a healthcare affordability product distributed through healthcare providers—Malven convinced his then-partner at 4490, Greg Robinson, to use 4490's funds to provide additional bridge loan capital to keep the company alive long enough to do a recapitalization. The recapitalization occurred (Series AA financing), which set a $5 million pre-money valuation on the company, and it closed in April 2023. The board at the close of the Series AA was Mr. Malven, Mr. VandenBosch and Hin-King Tai.

In the second half of 2023, Mr. Malven negotiated his exit from 4490 Ventures with the intent of founding a new venture capital firm, Klondike Capital, in partnership with Gian Fulgoni. Mr. Malven made his intent to start Klondike Capital known to Mr. VandenBosch numerous times, both verbally and in writing. In October

January 13, 2026
Page | 3

2023, Malven resigned from the 4490-controlled seat on the HealthBridge board and was replaced by Greg Robinson. The board then consisted of Mr. Robinson, Mr. VandenBosch, and Mr. Tai.

In October 2023, Mr. VandenBosch (as CEO and board member of HealthBridge) approached Mr. Malven about joining the Company full-time as the Head of Capital Markets. Mr. Malven was reluctant to leave his venture capital career to join HealthBridge full-time, but he was open to doing so if he could share a sufficient amount of the upside in the Company given its uncertain future and promising business model.  As a reference point, Mr. Malven had conveyed to Mr. VandenBosch that his total compensation over the last several years had been ~ $2.8 million per year (~$750K in paid cash compensation each year and the rest in carried interest incentive compensation).

Through a series of verbal conversations, written correspondences, and spreadsheets shared between Mr. Malven and Mr. VandenBosch during November 2023 through January 2024, Mr. Malven's compensation package for joining as Head of Capital Markets was defined to consist of:

(a) a salary of $300,000 with payment deferred until the close of equity financing;

(b) a non-discretionary fund-raising bonus structure of a $150,000 payment upon closing of an equity round and another non-discretionary $150,000 payment on closing of the next credit facility;

(c) a time-vested grant of 343,510 options (at a $0.15 exercise price) with a 48-month vesting period and a 12-month cliff;[1]

(d) a performance-based grant such that if Mr. Malven raised equity financing via a traditional VC-round preferred convertible security, he would receive options (at a $0.15 exercise price) for 1% equity in the company at $100 million in revenue, another 1% at $200 million in revenue, and another 1% at $300 million in revenue (**totaling 627,661 options or  roughly 3%**) (known as the "1/1/1 Structure"); but if Mr. Malven raised financing at a materially higher effective valuation through the use of a redeemable preferred security, he would receive options for 3% equity at each of those milestones (**totaling 1,882,983 options or roughly 9%**) (known as the "3/3/3 Structure").[2] [3]

---

[1] These are post-split numbers. The pre-split number contained in the final spreadsheet presented to Mr. Robinson is a grant of 17,175,508 options. The company subsequently underwent a 50-to-1 reverse split, resulting in 343,510 as the post-split number reflected here. The pre-split 409A board-approved exercise price at the time was $0.003. On a post-split basis, the exercise price was adjusted to $0.15.

[2] These are also post-split numbers. The pre-split numbers contained in the spreadsheet are 31,383,050 options for the 1/1/1 Structure and 94,149,174 options for the 3/3/3 Structure.

[3] At least two facts demonstrate the reasonableness of this agreement. First, the Company had no customers (Trinity Health had not executed the agreement yet) and no revenue and continued to have no revenue for about another full year, so the likelihood of hitting even the first $100 million milestone was scant.  Second, the Company had no one with capital markets experience and Malven's

January 13, 2026
Page | 4

Mr. Malven explained to Mr. VandenBosch (including in writing) that this performance grant language was "on the same terms as you [Mr. VandenBosch] and Amy [Chambers, the COO] so we remained 100% aligned."  Critically, as both Mr. Malven (as board member who reviewed and approved those agreements for Mr. VandenBosch and Ms. Chambers) and Mr. VandenBosch understood, those "same terms" meant that these option grants would survive termination (except in circumstances not applicable here) to prevent the company from terminating those grants to avoid payment before hitting any thresholds.

On November 20, 2023, Mr. VandenBosch (in writing) said there was "no issue" with the salary or the "fund raising bonus," but indicated that he had a "hard time defending" the "3/3/3 performance equity grants" because others would ask for the same, and suggested "let's think about this one."

In parallel to this negotiation, in December 2023, Malven identified and fixed major analytics flaws that the then-CFO of HealthBridge (Paul Iles) had made in the company's reporting of its historical collection curve and related analytics during the 2020 to 2023 time period.  The company would not be able to raise a credit facility unless the company threw out the CFO's work and completely redid the analytics in a way that would survive investor diligence.  Mr. Malven informed Mr. VandenBosch of these issues and instructed him to immediately pull down all data from investor data rooms while Mr. Malven corrected it. Mr. Malven (an accomplished software programmer) completely re-constructed the company's data analytics package. His analytics work made the company financeable to credit facility investors. Mr. Malven's work also provided a tangible demonstration of the value Mr. Malven would bring to HealthBridge and greatly increased Mr. VandenBosch's determination to have Mr. Malven join the company as Head of Capital Markets.

At the same time, HealthBridge again found itself within weeks of a winddown. Navidar, the investment bank the Company had engaged in August 2023 to raise equity capital, had produced zero prospects despite six months of effort, and none of the 100+ other existing individual and institutional investors was willing to re-invest because the Company had a high cash burn rate, zero revenue and zero customers (Trinity Health had not signed a customer or partnership agreement yet). Given the Company's dire situation, Mr. VandenBosch asked Mr. Malven if he could persuade Mr. Fulgoni to redirect Mr. Fulgoni's planned $1 million investment to seed Klondike Capital to instead support HealthBridge.

---

contribution of his time and skill in this area was similar to a founder-level contribution, and given that the Company's most recent financing round was at a $5 million pre-money valuation, Malven was engaging when there was still founder-level risk.

January 13, 2026
Page | 5

HealthBridge's only hope of survival was Mr. Fulgoni's $1 million investment. *However*, Mr. Fulgoni investing his $1 million in HealthBridge would be highly unlikely unless Mr. Malven, his long-time trusted business partner and the individual who had just discovered and resolved critical flaws in the Company's analytics approach, was part of the executive team.

Thus, as of January 2024, Mr. Malven was not just HealthBridge's only source of institutional investor-grade data analytics and capital markets knowledge (which is especially critical for a Specialty Finance company whose founders had zero experience in financial markets), but Mr. Malven's joining was an effectively essential condition for the Company to obtain desperately necessary capital (via his trusted relationship with Mr. Fulgoni).

On January 14, 2024, Mr. Malven sent Mr. VandenBosch his requested compensation package in final form ready for the board to review and approve. This document mapped out the specifics of the time-vested grant, the dilution existing investors would incur if the 3/3/3 Structure was triggered, and how the redeemable security would unwind more dilution than the 3/3/3 Structure incurred (making the 3/3/3 Structure combined with the redeemable security a net accretive event, not dilutive event, for shareholders).  Mr. Malven specifically told Mr. VandenBosch that this document was ready to be shared with Mr. Robinson. Mr. VandenBosch said he was "in the document now" and although he had a "couple of questions," he planned to talk to "Greg R tomorrow and we'll knock this out."

Mr. VandenBosch's "Greg R" refers to Greg Robinson. The board at the time consisted of Greg Robinson, Greg VandenBosch, and Hin-King Tai. Per the governing Series AA documents at that time, executive compensation packages only required majority board approval, plus the consent of the Series AA Director (who was also Greg Robinson). Accordingly, only Mr. VandenBosch and Mr. Robinson were required to agree to Mr. Malven's compensation package for it to become effective on behalf of HealthBridge.

On January 19, Mr. Robinson (who was the only Managing Director at 4490 Ventures following Mr. Malven's exit) executed Mr. Malven's separation agreement with 4490 Ventures, which contains a Transition Statement reflecting that Mr. Malven was "accepting a role as Head of Capital Markets for the 4490 Ventures portfolio company HealthBridge Financial, Inc." Accordingly, the only outstanding issue was whether Mr. Malven's *compensation structure* that Mr. Malven and Mr. VandenBosch had collaboratively defined would in fact be approved by Mr. Robinson.

On January 24 (and after), Mr. VandenBosch told Mr. Malven that Mr. Robinson approved it. He informed Mr. Malven, in writing, that:
- He had "Sent" the document containing Mr. Malven's proposed compensation package to Mr. Robinson;

January 13, 2026
Page | 6

- He relayed "Greg R said, 'I'm fine with Dan joining,'";
- Mr. VandenBosch further explained that he "[j]ust did a call with Greg R – he's all good. Went really well. Off to the Races!" thus conveying that Robinson and VandenBosch had discussed Malven's compensation package and approved it with no modifications or adjustments.

Mr. Malven thus reasonably understood that he was hired as Head of Capital Markets on January 24, 2024, with a board approved compensation package containing his requested salary, non-discretionary cash bonuses, a time-vested option grant, and a performance-vested option grant with a conditional trigger based on the form of equity raised. The performance-vested grant would be the 1/1/1 Structure (resulting in a net dilutive outcome) if Mr. Malven raised the equity round with a traditional security, and it would be the 3/3/3 Structure (resulting in a net accretive outcome) if Mr. Malven raised the equity round with a redeemable security.

Mr. Malven then worked full-time on behalf of HealthBridge—and HealthBridge knowingly accepted his existentially valuable services—for the next ***twenty-one months***.

If the majority of the board (Mr. Robinson and Mr. VandenBosch) had actually *not* approved that package, then Mr. VandenBosch (as CEO of HealthBridge) fraudulently induced Mr. Malven into walking away from his lucrative venture capital career, fixing and refining the Company's historical collection curve and analytics package, preparing all fund raising marketing and execution materials, orchestrating its equity and credit facility fundraising, and otherwise laboring for HealthBridge for nearly two years—all based on the premise that Mr. Malven's proposed compensation structure had received the requisite board approval. The Illinois First District Appellate Court has explained that actionable "fraud occurs when a misrepresentation is made with intent to induce a victim to rely thereon and a victim is deceived and relies thereon to his detriment," *Gagnon v. Schickel*, 983 N.E.2d 1044, 1054 (Ill. App 2012) (cleaned up).

Either way, Mr. VandenBosch acted with apparent authority, Mr. Malven reasonably relied on it, and Mr. Malven followed his new boss's instruction to get "off to the races." And because the Company was in such dire financial straits, Mr. Malven's salary between January 24 and April 26, 2024 was deferred until the Series AAA round, and then the majority of his compensation from April through December, 2024 was also deferred.

In early February 2024, Mr. Fulgoni invested $1 million into a SAFE note and simultaneously joined the board of directors, joining Mr. VandenBosch, Mr. Robinson and Mr. Tai as the fourth member of the board. Also in early February 2024, Trinity Health signed on as the Company's first customer of its new business model.

January 13, 2026
Page | 7

On April 26, 2024, the Series AAA round that Mr. Malven orchestrated closed. As a result, the deferred portion of Malven's salary and the first $150,000 non-discretionary cash bonus were due. Because it closed as a redeemable security structure (in the form of the Optional Preferred Payment (OPP) feature of the Series AAA security), it vested in Mr. Malven the 3/3/3 Structure performance grant (as explained above, providing Mr. Malven 1,882,983 options, contingent upon the Company meeting certain revenue thresholds). And on December 3, 2024, the next credit facility closed, triggering the second $150,000 non-discretionary cash bonus payable. All conditional elements of Mr. Malven's compensation package for the HCM position had been satisfied as of December 2024.

Shortly after the close of the Series AAA round, HealthBridge formed a compensation committee and appointed Mr. Fulgoni and Ms. Reller to it to expedite the memorialization and execution of employment agreements for Mr. Malven and other current and future employees.

However, Mr. Malven was *never* provided with an agreement reflecting the terms (including the 3/3/3 Structure) that HealthBridge's CEO told him that he and the other required board member approved in January 2024. Instead, whenever Mr. Malven inquired, Mr. VandenBosch repeatedly told Mr. Malven to be patient and that he would take care of it. Mr. VandenBosch abused Mr. Malven's trust in him for almost two years. Throughout 2024 and 2025, even as late as just a few weeks prior to his termination, Mr. VandenBosch was stringing along Mr. Malven with statements, both verbally and in writing, that were intended to keep him contributing his unique services to the Company. These statements included: "it [i.e. the memorialization of our agreement] will get done", "the Series AAA and OPP structure you came up with was perfect for our situation", "the Product and BI teams do not understand data analytics at all", "nobody in the company understands the data analytics other than you", "you are the best person to drive a sale of the company", and that memorializing the agreement was his "#1 priority."

By October 2025, Mr. Malven's patience ran out. In a series of increasingly strained written and verbal communications with Mr. VandenBosch and others, Mr. Malven signaled that he would demand formal documentation of his previously approved cash and equity compensation. Likely sensing that his ability to extract value from Mr. Malven without compensating him as agreed was nearing the end, and attempting to avoid remitting Mr. Malven said compensation, Mr. VandenBosch fired Mr. Malven without cause.

\*     \*     \*

The above facts give rise to at least the following causes of action: breach of contract, promissory estoppel, fraudulent inducement, unjust enrichment, and wage-

January 13, 2026
Page | 8

theft violations of the Illinois Wage Payment and Collection Act ("IWPCA"). The remedies include:

1) expectation damages, *i.e.*, what Mr. Malven was promised in exchange for his almost two years of work;

2) statutory penalties under the IWPCA, including 5% monthly statutory penalties on all unpaid amounts (both cash and equity), all attorneys' fees, and personal liability for Mr. VandenBosch and for any other officers or agents who knowingly permitted the violations;

3) punitive damages for the fraudulent acts; and

4) quantum meruit for the unjust enrichment.

(1) Expectation damages equal what Mr. Malven was promised and agreed. That would include **$485,260** in cash, representing both of his earned $150,000 performance bonuses plus the $185,260 in accrued deferred salary from January to December 2024.

It would also include the 343,510 options for shares at a $0.15 strike price. A highly conservative estimated fair value[4] of $15 per share as of October 2025 would mean that even just the intrinsic value of the 343,510 options is $14.85 per share, which means a conservative estimate of the dollar value for those options is $5,101,123. However, given that Mr. Malven's employment lasted only 21 months into a 48-month vesting period, the conservative estimate for the options owed to him is **$2,231,741**.

And Mr. Malven's expectation damages would include the 3/3/3 Structure (up to 1,882,983 options at a $0.15 strike price depending on the Company hitting revenue targets described above). Assuming (so conservatively as to be implausible) that the fair value of the shares only doubles to $30 per share as the Company grows from $0 revenue to $100 million, $200 million, and $300 million revenue—the 3/3/3 Structure would be the cash equivalent of $56,207,042.[5] That amount can be discounted by the chances that HealthBridge hits those targets, but as of today, that

---

[4] The 2024 audit of 4490 Ventures II, L.P. performed by the independent third-party firm of Baker Tilly adheres to ASC 820 – Fair Value Measurement guidelines. This audit report placed a fair value on the Company's common stock slightly below $15 per share for the measurement period ending December 31, 2024. Given the material improvement in the company's performance and prospects from January through October 2025, an estimated fair value of $15 per share as of October 2025 seems highly conservative.

[5] As discussed above, the board-approved terms of Malven's 3/3/3 Structure grant was the same as VandenBosch and Chambers, in that the grants do not extinguish if the executive is terminated without cause. Malven, in his role as the Series AA board member negotiating with VandenBosch and Chambers regarding their performance grants, explicitly agreed to that term on the Company's behalf in order to remove the Company's incentive to extinguish those grants by terminating VandenBosch or Chambers without cause. Specifically, if the Company achieved those extremely high levels of performance at any time, then VandenBosch and Chambers would reap the benefits even if they have been terminated, and now it appropriately and equally applies to Malven.

January 13, 2026
Page | 9

chance is at least 50%.  Accordingly, conservatively and fully risk-discounted, the 3/3/3 Structure reflects a cash equivalent of over **$28,103,521**.

Accordingly, over **$30.5 million in value** has been seized from Mr. Malven in owed compensation alone.

(2) The purpose of the IWPCA is to "ensure that employees receive all earned benefits upon leaving their employer and the evil it seeks to remedy is the forfeiture of any of those benefits." *Mueller Co. v. Department of Labor*, 187 Ill.App.3d 519, 524, 135 Ill.Dec. 135, 543 N.E.2d 518 (1989). "Illinois courts have explained that an agreement under the IWPCA is broader than a contract" such that the IWPCA "requires only a manifestation of mutual assent on the part of two or more persons; parties may enter into an 'agreement' without the formalities and accompanying legal protections of a contract." *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012) (citations and internal quotation marks omitted).

"Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed . . . in a civil action, . . . the amount of any such underpayments and damages of **5% of the amount of any such underpayments for each month** following the date of payment during which such underpayments remain unpaid." 820 Ill. Comp. Stat. Ann. 115/14 (emphasis added).  Such compensation is defined broadly to include "any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 Ill. Comp. Stat. Ann. 115/2. "Courts have explained that these damages are 'mandatory,' rather than discretionary, so the damage amounts are fixed and 'must be awarded' to plaintiffs that prevail on liability." *Noe v. Birk*, No. 1:21-CV-01668, 2025 WL 3306136, at *4 (N.D. Ill. May 8, 2025).

In short, the IWPCA imposes a mandatory 5% statutory penalty for every month that compensation is not paid (including during any litigation) on both cash and equity components of Mr. Malven's unpaid compensation.

As described above, Mr. Malven earned salary throughout 2024 that was accrued (yet remains unpaid) beginning 24 months ago in January 2024.  By way of example, the unpaid February 2024 salary ($23,835) would therefore be subject to an additional **115%** of mandatory statutory damages, meaning that Mr. Malven is owed $51,247 for that month alone. His two $150k performance bonuses (earned in April 2024 and December 2024) are now worth $315,000 and $247,500, respectively. Assuming payment in January 2026, Mr. Malven is owed $925,747 for just his salary and bonuses. The chart below demonstrates the amounts owed for Mr. Malven's cash compensation.

January 13, 2026
Page | 10

| Description | Earned Date | Initial $ Value | # of Months [1] | Penalty / Mo | Total Value |
|---|---|---|---|---|---|
| Series AAA Closing Bonus | April 26, 2024 | $150,000 | 22 | 5% | $315,000 |
| Credit Facility Closing Bonus | December 3, 2024 | $150,000 | 13 | 5% | $247,500 |
| January 2024 Accrued Salary | January 31, 2024 | $5,753 | 24 | 5% | $12,658 |
| February 2024 Accrued Salary | February 29, 2024 | $23,836 | 23 | 5% | $51,247 |
| March 2024 Accrued Salary | March 31, 2024 | $25,479 | 22 | 5% | $53,507 |
| April 2024 Accrued Salary | April 30, 2024 | $24,658 | 21 | 5% | $50,548 |
| May 2024 Accrued Salary | May 31, 2024 | $15,288 | 20 | 5% | $30,575 |
| June 2024 Accrued Salary | June 30, 2024 | $14,795 | 19 | 5% | $28,849 |
| July 2024 Accrued Salary | July 31, 2024 | $15,288 | 18 | 5% | $29,047 |
| August 2024 Accrued Salary | August 31, 2024 | $15,288 | 17 | 5% | $28,282 |
| September 2024 Accrued Salary | September 30, 2024 | $14,795 | 16 | 5% | $26,630 |
| October 2024 Accrued Salary | October 31, 2024 | $15,288 | 15 | 5% | $26,753 |
| November 2024 Accrued Salary | November 30, 2024 | $14,795 | 14 | 5% | $25,151 |
| January 2026 Value | | | | | $925,747 |
| Per Month Accrual | | | | | $46,287 |

[1] The # of Months assumes the compensation is paid in January 2026. If the compensation is paid at a later time, these numbers will increase.

The **$925,747** in unpaid cash compensation continues to accrue at 5%—**or $46,287.35 per month**—until paid, including in any litigation.

Moreover, Mr. Malven's "stock options fall under the notion of any other compensation" under the IWPCA. *Rawat v. Navistar Int'l Corp.*, No. 08-CV-04305, 2012 WL 37110, at *9 (N.D. Ill. Jan. 4, 2012). Thus, the same 5% monthly multiplier calculation applies for the time-vested share, which, as explained previously are conservatively worth $2,231,741. The chart below demonstrates that the IWPCA amount is currently equal to **$3,331,673**. And it too continues to accrue at 5%—or **$166,583.64 per month**—until paid, including in any litigation.

| Earned Date | # Vested [1] | Initial $ Value | # of Months [2] | Penalty / Mo | Total Value |
|---|---|---|---|---|---|
| January 23, 2025 | 85,878 | $1,275,281 | 12 | 5% | $2,040,450 |
| February 23, 2025 | 7,156 | $106,273 | 11 | 5% | $164,724 |
| March 23, 2025 | 7,156 | $106,273 | 10 | 5% | $159,410 |
| April 23, 2025 | 7,156 | $106,273 | 9 | 5% | $154,097 |
| May 23, 2025 | 7,156 | $106,273 | 8 | 5% | $148,783 |
| June 23, 2025 | 7,156 | $106,273 | 7 | 5% | $143,469 |
| July 23, 2025 | 7,156 | $106,273 | 6 | 5% | $138,155 |
| August 23, 2025 | 7,156 | $106,273 | 5 | 5% | $132,842 |
| September 23, 2025 | 7,156 | $106,273 | 4 | 5% | $127,528 |
| October 23, 2025 | 7,156 | $106,273 | 3 | 5% | $122,214 |
| January 2026 Value | | | | | $3,331,673 |
| Per Month Accrual | | | | | $166,584 |

[1] The agreed upon vesting schedule was 48 months term, monthly vest, with a 12 month cliff; therefore the January 23, 2025 vested number is 12 months worth, with all subsequent periods being one months worth.

[2] The # of Months assumes the compensation is paid in January 2026. If the compensation is paid at a later time, these numbers will increase.

January 13, 2026
Page | 11

Accordingly, Your IWPCA damages exposure for the acts detailed herein statutorily increase by over **$200,000 per month** until this matter is resolved.

Finally, the IWPCA also requires You to pay for Mr. Malven's attorneys' fees in collecting these unpaid wages. *See* 820 Ill. Comp. Stat. Ann. 115/14 ("In a civil action, such employee shall also recover costs and all reasonable attorney's fees.").

(3)  Even if there were no enforceable agreement (there was), then You fraudulently induced Mr. Malven to labor for HealthBridge for nearly two years on the pretense that his proposed compensation was agreed to by the board of HealthBridge.  "Fraud is a common ground of punitive damages in Illinois." *Back Drs. Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 831 (7th Cir. 2011). And such punitive damages can roughly equal the expectation damages. *See, e.g.*, *id.* ("A punitive award exceeding $2.1 million is possible in this litigation" where the actual damages were $2.9 million). Accordingly, Your punitive damages exposure for the fraudulent acts detailed herein increases your total exposure to roughly **$60 million**.

(4) Finally, even if there were no enforceable agreement and even if there was no fraud, then at a minimum, You were unjustly enriched by inducing Mr. Malven to labor for HealthBridge for nearly two years. Under an unjust enrichment claim, Mr. Malven is entitled to quantum meruit, *i.e.*, the value Mr. Malven contributed to the Company, which would likely *exceed* the above damages.

Without Mr. Malven's efforts at various junctures, the Company would likely not exist. By way of just one example, without Mr. Malven's work to correct the prior CFO's analytical errors, the company would not have been able to raise capital and would have been wound down. Moreover, Mr. Malven's contributions in structuring and raising the Series AAA, and in personally performing all of the analytics work during the Trinity pilot period from February 2025 through October 2025, materially contributed to HealthBridge valuation increasing from ~ $30 million in January 2024 to ~ $550 million in October 2025.  Based on the financial and data analytics infrastructure built in large part by Mr. Malven, HealthBridge is expected to achieve a valuation well in excess of $1 billion in the next 12–18 months.

\*     \*     \*

All that said, and as I mentioned at the outset, Mr. Malven would prefer an amicable resolution because he still sincerely hopes that the Company succeeds. Accordingly, _for the purposes of this settlement offer only_, Mr. Malven is (i) willing to forego the IWPCA statutory penalties, punitive damages, and attorneys' fees; and is also open to reasonable counter-offers involving cash, common stock, preferred stock,

January 13, 2026
Page | 12

and/or debt instruments.  This is designed to account for the Company's relatively unique capital structure, current revenue levels, current cash position, and expected future value creation so as to mitigate the impact of a settlement on the Company's ability to realize its value creation potential.

## II.  PRESERVATION OBLIGATIONS

Although Mr. Malven hopes that a pre-suit settlement may be reached, we must prepare for the possibility that negotiations do not successfully resolve these claims.

Accordingly, in light of the above, I am writing to formally notify You and Your agents (including any of Your employees, attorneys, accountants, and contractors) of their obligation to preserve all evidence, documents, communications, or electronically stored information ("ESI"), as defined by Rule 34 of the Federal Rules of Civil Procedure, related to the facts and events described above.

To fulfill Your preservation obligations, You must ensure that You and Your agents take reasonable steps to preserve all relevant hard copy documents and ESI, including but not limited to:

(a) Suspending document and data destruction and backup recycling policies;
(b) Retaining software, hardware, or other information required to access or view the ESI;
(c) Taking actions to preserve archived or deleted ESI, ESI stored in a database, computer logs, and metadata;
(d) Taking any other reasonable steps necessary to prevent the destruction, loss, override, or modification of relevant data, either intentionally or inadvertently, such as through modification of your document retention policy and systems.

This list is not exhaustive, and You and Your agents must preserve all information that is potentially relevant to the categories referenced above. Please know that failure to preserve such documents and information may constitute spoliation of evidence and may result in legal consequences, including sanctions or adverse inferences in any related litigation. Therefore, it is imperative that You and Your agents take immediate steps to ensure that all relevant information is preserved and not destroyed or altered.

\*     \*     \*

To say the obvious, nothing herein, nor any related act or omission, are intended to be or should be deemed as a waiver, modification, or reduction of any rights, claims, defenses, or remedies that Mr. Malven may have regarding his dispute

January 13, 2026
Page | 13

with You.   Nor is this letter a full and complete statement of the facts and circumstances that form the basis of Mr. Malven's dispute with HealthBridge. Again, he expressly reserves all rights and remedies available at law and equity.

      To reiterate, please confirm promptly (i) receipt of this letter and (ii) implementation of a litigation hold and compliance with the preservation obligations below.  And, if you are interested in an amicable resolution, and we hope you are, please indicate as much with your proposal by the end of the week—on or before Friday, **January 16, 2026, at 5:00 p.m. CT**.

      As we have been engaged by Mr. Malven, you no doubt already are aware that You may not contact Mr. Malven personally. Instead, please contact me by email at lgail@masseygail.com.

      Thank you for your prompt attention to this matter.

Sincerely,

MASSEY & GAIL LLP

*/s/ Lenny Gail*
Leonard A. Gail, Esq.

Cc: Bret R. Vallacher, Esq.